IN THE UNITED STATES DISTRICT COURT

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.
2009 JUL 29 P 3: 56
CLERK J Burton

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| ANTHONY D. THOMPSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 106-099 |
| | ) | |
| BRET CARANI, et al., | ) | |
| | ) | |
| Defendants. | ) | |

---

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

Plaintiff Anthony D. Thompson, an inmate currently incarcerated at the Washington State Prison located in Davisboro, Georgia,[1] commenced the above-captioned case pursuant to 42 U.S.C. § 1983. Plaintiff is *pro se* and proceeding *in forma pauperis*. The matter is now before the Court on the motion for summary judgment filed by Defendants Woods, Carani, Ellis, Williams, Cook, and Streetman ("the Columbia County Defendants"). (Doc. no. 100). Plaintiff opposes the motion. (Doc. no. 127). For the reasons set forth below, the Court **REPORTS** and **RECOMMENDS** that the Columbia County Defendants' motion for summary judgment (doc. no. 100) be **GRANTED IN PART** and **DENIED IN PART**, that a final judgment be **ENTERED** in favor of Defendants Woods, Carani, and Cook, and that Plaintiff's remaining excessive force claims against Defendants Ellis, Williams, and Streetman should proceed.

---

[1]The Court notes that the events forming the basis of the above-captioned complaint occurred while Plaintiff was incarcerated at the Columbia County Detention Center ("CCDC") located in Appling, Georgia. (Doc. no. 39, pp. 5-11).

# I. STATEMENT OF FACTS

## A.    Plaintiff's Version[2]

Plaintiff claims that, while he was incarcerated at the CCDC, his mail was mishandled and sometimes opened by Defendants Woods and Carani outside of his presence. (See doc. no. 39, p. 9). Plaintiff avers that, on December 1, 2003, Defendant Woods opened a letter he received from the United States District Court outside of his presence. (Id.). Plaintiff contends that, after learning that some of his letters did not reach their intended destinations, including the National Association for the Advancement of Colored People ("NAACP"), he filed a grievance concerning the mishandling of his mail on August 9, 2004. (Id.). Plaintiff provides a copy of a letter, dated June 30, 2004, sent to him from the NAACP, which indicates, inter alia, that the NAACP received his letter and apologized for the delayed response. (Doc. no. 127, Ex. 2).

Plaintiff claims that, while he was incarcerated at the CCDC, Defendant Woods implemented a policy allowing only foreign nationals to utilize certain calling cards. (Doc. no. 39, p. 9). Plaintiff avers that, after he was allowed to utilize a certain calling card on January 15, 2004, Defendant Woods implemented the contested policy. (See id.; doc. no. 127, pp. 9-11 & 13). Plaintiff contends that, after he attempted to utilize the subject calling cards on January 16 and 23, 2004, he was disciplined. (See doc. no. 39, p. 9; doc. no. 127,

---

[2]As the amended complaint (doc. no. 39) is sworn and describes facts based upon Plaintiff's personal knowledge, it meets the requirements of 28 U.S.C. § 1746 and Fed. R. Civ. P. 56(e) and is sufficient to create an issue of material fact in response to the instant motion for summary judgment. See U.S. v. Four Parcels of Real Property, 941 F.2d 1428, 1444 (11th Cir. 1991) (en banc). Thus, the Court's recitation of Plaintiff's version of events is taken from the amended complaint, as well as Plaintiff's affidavit submitted in opposition to the instant motion (doc. no. 127, Pl.'s Aff.) and the various exhibits attached to Plaintiff's response to the instant motion

pp. 11-12, Exs. 4 & 5). Plaintiff maintains that he made a final attempt to acquire the subject calling cards and filed a grievance concerning the matter in July 2004, but he did not receive a response. (Doc. no. 39, p. 9). Plaintiff explains that the subject calling cards had different international and domestic calling rates, that the calling cards "could have been processed like commissary," and that use of the calling cards would have given him benefits extended to foreign nationals. (Doc. no. 127, Pl.'s Aff., ¶¶ 3, 5 & 9). Plaintiff concludes that Defendant Woods implemented the policy to prevent him from communicating with officials and his family about his allegations of civil rights violations. (Id. ¶ 3).

Plaintiff claims that, because the CCDC had an "insect problem," he was subjected to unconstitutional conditions of confinement during his incarceration at the CCDC. (Doc. no. 39, p. 9). Plaintiff avers that he filed a grievance concerning the "insect problem" on August 2, 2004. (Id.). Plaintiff contends that the CCDC was not treated by an exterminator until after he was severely bitten by an insect on August 21, 2004. (Id.). Plaintiff concludes that, despite his multiple requests and grievances concerning "inspect problems," Defendant Woods did not properly respond. (Id.).

Plaintiff claims that, on August 8, 2004, Defendants Ellis, Williams, and Cook used excessive force to maliciously and sadistically cause harm to him because he previously accused a deputy of evidence tampering, filed grievances and lawsuits, and disclosed that Defendant Ellis was under the influence of narcotics. (Id. at 6). Plaintiff avers that, while he and Defendant Ellis were discussing "directions" provided by an unnamed nurse, Defendant Ellis, who was under the influence of narcotics, closed a door on his foot, causing him to use an explicative. (Id.). Plaintiff contends that Defendant Ellis then became

3

enraged, backed him into his cell by pointing pepper spray at his face, and ordered him to the "hole." (Id.). Plaintiff maintains that, although he never made any "threatening advances" or "squared up to fight [Defendant] Ellis" (doc. no. 127, Pl.'s Aff., ¶ 13), he grabbed a towel on his bed. (Doc. no. 39, p. 6). Plaintiff submits that Defendant Ellis then approached the bed where he was sitting and pointed pepper spray at his face. (Id.).

Plaintiff further avers that, after Defendant Williams and Deputy Robertson arrived at his cell, Defendant Ellis began to use the pepper spray while he was sitting on his bed. (Id.). Plaintiff contends that, after he covered his face with the towel and "went to the floor" to avoid the pepper spray, Defendant Williams ordered Defendant Ellis and Deputy Robertson to uncover his face so it could be sprayed. (Id.). Plaintiff maintains that, after the officers continued their efforts to spray him in the face, be attempted to stand while Deputy Robertson was on his back. (Id.). Plaintiff explains that, after Defendant Williams advised him that he would not be sprayed, he "gave up" his hands, which were then handcuffed, and he was escorted to the "hole." (Id.). Plaintiff submits that, as a result of this incident, he suffered from various injuries, eye irritation, and asthma attacks. (Id.; doc. no. 127, Pl.'s Aff, ¶15). Plaintiff provides the notarized statement of Inmate Richard H. Chapman, who states that, on August 8, 2004, he cleaned pepper spray on Plaintiff's mattress and that he heard Defendant Cook "developing a story" to indicate "aggravating behavior" by Plaintiff because "[Defendant] Ellis just 'went off.'" (Doc. no. 127, Ex. 9).

Plaintiff claims that Defendant Cook retaliated against him because he filed lawsuits and administrative grievances. (Doc. no. 39, p. 7). Plaintiff avers that, after he was escorted to the "hole" on August 8, 2004, Defendant Cook stated, "Since you want to file lawsuits and

4

say that my officers are high, [I am] going to take charges out on you." (Id. at 7). Plaintiff

contends that, on August 9, 2004, he was falsely charged with obstruction of an officer. (Id.).

Plaintiff maintains that the three false criminal warrants were subsequently dismissed

because Defendant Ellis was intoxicated.[3] (See doc. no. 127, Pl.'s Aff., ¶ 12).

Plaintiff claims that, on August 31, 2004, Defendant Streetman used excessive force

to maliciously and sadistically cause harm to him because, *inter alia*, he previously accused

a deputy of evidence tampering and filed grievances and lawsuits. (Doc. no. 39, p. 7).

Plaintiff avers that, because he performed some chores for Officer Hyson on August 31,

2004, Officer Hyson agreed to allow Plaintiff to remain outside of his cell for some extra

time. (Id.). Plaintiff maintains that, while he was explaining the arrangement to another

officer, Defendant Streetman ordered him to return to his cell using an explicative. (Id.).

Plaintiff explains that, while he was talking with Officer Hyson, Defendant Streetman blind-

sided him, sprayed him in the face with pepper spray, and shoved him into his cell. (Id.; doc.

no. 127, Pl.'s Aff., ¶ 14). Plaintiff concludes that, as a result of Defendant Streetman's

actions, he suffered from severe eye irritation, burning, skin irritation, and asthma attacks,

which continue to this day. (Doc. no. 39, p. 7; doc. no. 127, Pl.'s Aff., ¶ 15).

---

[3] Plaintiff provides an inmate request form, wherein Defendant Woods indicates, *inter alia*, that the warrants were dismissed at the officers' suggestion because he requested to get "into the system." (Doc. no. 127, Ex. 13). Plaintiff also submits a grievance, wherein the responding officer indicates that all "Columbia County charges" were dismissed "[p]er the District Attorney[']s Office." (Id., Ex. 14).

**B. The Columbia County Defendants' Version**

At all times relevant to this case, Defendant Woods, who was employed by the Columbia County Sheriff's Office ("CCSO") as a Staff-Sergeant, was responsible for policy implementation, maintenance and security of the CCDC, and Defendant Carani, who was employed by the CCSO as a Captain, was responsible for the CCDC's general operation. (Doc. no. 107, Woods Aff., ¶¶ 2-3, Carani Aff., ¶¶ 2-4). As it relates to Plaintiff's mail-tampering claim, Defendant Woods avers that, on December 1 and 5, 2003, Plaintiff filed grievances complaining that certain legal mail had been opened outside his presence. (Id., Woods Aff., ¶¶ 5 & 15). Defendant Woods contends that he then informed Plaintiff that the CCDC does not routinely inspect court mail outside of the recipient's presence. (Id. ¶ 16). Defendant Woods and Carani maintain that their duties did not involve opening, handling, or distributing mail; that they did not open or direct anyone to open confidential mail addressed to Plaintiff; that they did not read or receive any confidential mail addressed to Plaintiff; that they did not take any action to prevent or direct anyone to prevent Plaintiff from sending mail; that they did not tamper, or direct anyone to tamper, with Plaintiff's outgoing mail; that they did not interfere with Plaintiff's right to receive mail; and that the CCDC does not tamper with inmate mail. (Id., Woods Aff., ¶¶ 17-24, Carani Aff., ¶¶ 6-13).

Addressing Plaintiff's equal protection claim, Defendant Woods avers that CCDC inmates are permitted to use telephones to communicate with their families and attorneys, to make collect telephone calls, and to utilize the Pay-Tel Telephone System by having money added to their account.[4] (Id., Woods Aff., ¶¶ 26-27 & 29). Defendant Woods

---

[4]According to Defendant Woods, because the Pay-Tel Telephone System is administered by Pay-Tel Communications, Inc., the administrative and logistical burden of

contends that CCDC policy only permits inmates, who are foreign nationals, to purchase international calling cards.[5] (Id. ¶¶ 31 & 37). Defendant Woods maintains that, in early 2004, Plaintiff filed grievances concerning acquisition of an international calling card and that, in January 2004, he was disciplined for using a restricted calling card. (Id. ¶¶ 38 & 40).

As it relates to Plaintiff's conditions of confinement claim, Defendant Woods avers that, on August 2, 2004, Plaintiff filed a grievance concerning "a problem with ants." (Id. ¶ 6). Defendant Woods contends that, although he informed Plaintiff that the CCDC is sprayed monthly for insects and that he could ask his housing deputy for additional treatment,[6] Plaintiff never asked his housing deputy for an extermination. (Id. ¶¶ 7-8). Defendant Woods maintains that, in response to Plaintiff's grievance, he informed the appropriate maintenance personnel of the potential ant problem and requested that the appropriate action be taken. (Id. ¶ 9). Defendant Woods submits that, on August 28, 2004, he first learned about spiders in the CCDC when Plaintiff filed a grievance related to an

---

permitting inmates to make collect telephone calls and to use the system is relatively light. (Doc. no. 107, Woods Aff., ¶¶ 28 & 34). Defendant Woods explains, "The Pay-Tel telephone system uses prepaid accounts to cover the cost of inmate telephone calls. Under the system, money is added to an inmate's account, and the cost of telephone calls made by that inmate is deducted from the account . . . ." (Id. ¶ 28).

[5]Defendant Woods submits that, after written requests for international calling cards are processed, the cost of the card is deducted from the inmate's account, if the account has sufficient funds, and the CCDC keeps a record on file. (Doc. no. 107, Woods Aff., ¶ 33). Defendant Woods explains that, because the CCDC houses few foreign nationals, allowing them to purchase these cards imposes a light administrative and logistical burden, but allowing all inmates to purchase them would impose an unduly heavy burden. (Id. at 36).

[6]The Columbia County Defendants provide the affidavit of Ms. Leanne DeLoach, Director, Columbia County Finance Department, who maintains the billing records from Barnes Exterminating, which is the company that provided extermination services to the CCDC in June, July, and August 2004. (Doc. no. 107, DeLoach Aff., Ex. 1).

alleged spider bite. (Id. ¶ 10). Defendant Woods provides several Grievance Reports confirming his assertions about Plaintiff's grievances and the respective responses, and the CCSO Bureau of Detention and Court Services Standard Operating Procedure ("SOP") confirming his assertions about the use of telephones and the availability of calling cards. (See id., Woods Aff., Ex. 1-5).

At all times relevant to this case, Defendants Ellis, Williams, and Cook were employed by the CCSO as a Deputy, Sergeant, and Lieutenant, respectively, and on August 8, 2004, they worked at the CCDC. (Id., Ellis Aff., ¶¶ 2-4, Williams Aff., ¶¶ 2-4, Cook Aff., ¶¶ 2-4). Addressing Plaintiff's excessive force claim, Defendant Ellis avers that, after instructing Plaintiff to back away from the A-Max doorway on August 8, 2004, Plaintiff called him an explicative name.[7] (Id. Ellis Aff., ¶¶ 6-9). Defendant Ellis contends that, after he re-entered A-Max, Plaintiff called him another explicative name, and thus, he directed Plaintiff to accompany him to C-Max. (Id. ¶¶ 12-13). Defendant Ellis maintains that, after Plaintiff "squared up as if to fight [him]," he pointed a can of pepper spray at Plaintiff and warned that it would be used if Plaintiff did not comply. (Id. ¶¶ 15-16). Defendant Ellis submits that, after Plaintiff wrapped a towel around his head in an apparent attempt to reduce the effectiveness of the pepper spray, he again instructed Plaintiff to accompany him to C-Max. (Id. ¶¶ 19-22). Defendant Ellis explains that, after Plaintiff remained in his cell and stated, "Do what you have to do, spray me," he sprayed Plaintiff with the pepper spray to

---

[7]Defendant Ellis submits, "It is a violation of [CCDC] policy for an inmate to use profane or vulgar language or for an inmate to show disrespect to [CCDC] personnel. An appropriate penalty for a violation of these policies is to place the inmate in disciplinary segregation in C-Max . . . ." (Doc. no. 107, Ellis Aff., ¶ 11).

avoid a physical confrontation and to maintain order.[8] (Id. ¶¶ 24 & 29-31). Defendant Ellis concludes that his training has taught him that pepper spray can make the target temporarily uncomfortable, effectively resolve disturbances without actually harming individuals, and reduce the likelihood of escalated violence. (Id. ¶¶ 32-33).

Defendant Williams avers that, on August 8, 2004, he responded to a call for assistance in A-Max, where Plaintiff had been sprayed with pepper spray. (Id., Williams Aff., ¶¶ 5-6). Defendant Williams contends that he and Deputy Robertson then entered Plaintiff's cell to assist Defendant Ellis. (Id. ¶ 7). Defendants Williams and Ellis maintain that, because Plaintiff was uncooperative, resisting, and fighting, they handcuffed Plaintiff to prevent disorderly and combative behavior. (Id. ¶¶ 8-14, Ellis Aff., ¶¶ 35-38 & 40). Defendants Williams and Ellis conclude that, on August 9, 2004, they obtained criminal warrants for obstruction of an officer based on Plaintiff's behavior. (Id., Williams Aff., ¶ 19, Ellis Aff., 45). Defendant Ellis and Williams provide copies of their criminal warrants, Defendant Williams's August 8, 2004 statement, as well as Defendant Ellis's Use of Force and Incident Reports. (Id., Exs. 1 & 2, Ellis Aff., Exs. 1-3).

At all times relevant to this case, Defendant Cook was employed by the CCSO as a Lieutenant, and on August 8, 2004, he worked at the CCDC. (Doc. no. 107, Cook Aff., ¶¶ 2-4). As it relates to Plaintiff's retaliation claim, Defendant Cook avers that, after he responded to a call concerning a disturbance on August 8, 2004, he was informed that Plaintiff was handcuffed after being sprayed with pepper spray because he fought with

---

[8]Defendant Ellis maintains that he was aware that Plaintiff had been involved in several violent altercations with CCDC inmates and staff, had a tendency to ignore orders, and had a tendency to engage in disorderly conduct. (Doc. no. 117, Ellis Aff., ¶¶ 25-27).

officers. (Id. ¶¶ 5-8). Defendant Cook maintains that he was not present during the incident and that he did not use force against Plaintiff. (Id. ¶¶ 9-10). Defendant Cook explains that, after learning about Plaintiff's behavior, he advised the officers involved in the incident that it would be appropriate for them to obtain criminal warrants against Plaintiff. (Id. ¶¶ 11-13).

At all times relevant to this case, Defendant Streetman was employed by the CCSO as a Deputy, and on August 31, 2004, he worked in the C-Max area of the CCDC. (Doc. no. 107, Streetman Aff., ¶¶ 2-4). Addressing Plaintiff's excessive force claim, Defendant Streetman avers that, on August 31, 2004, Plaintiff refused to return to his cell as directed. (Id. ¶¶ 6-7). Defendant Streetman contends that, in an apparent attempt to reduce the effectiveness of pepper spray, Plaintiff then covered his face with a towel and stated, "[I have] nothing to lose, [I am] not going in."[9] (Id. ¶¶ 8-12). Defendant Streetman maintains that, after Plaintiff ignored a warning, Plaintiff was sprayed in an effort to maintain order and avoid physical confrontation. (Id. ¶¶ 18-24). Defendant Streetman submits that his training with pepper spray taught him that it can make the target temporarily uncomfortable, effectively resolve disturbances without actually harming individuals, and reduce the likelihood of escalated violence. (Id. ¶¶ 25-26). Defendant Streetman provides a copy of the Use of Force and Incident Reports. (Id., Exs. 1 & 2).

---

[9]Defendant Streetman contends that, on August 31, 2004, he was aware that Plaintiff had been involved in several violent altercations with CCDC inmates and staff, had a tendency to ignore orders, had a tendency to engage in disorderly conduct. (Doc. no. 117, Streetman Aff., ¶¶ 14-16).

## II. DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Applicable substantive law identifies which facts are material in a given case.[10] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When seeking summary judgment, the movant must show, by reference to materials on file, that there are no genuine issues of material fact to be decided at a trial. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). If the burden of proof at trial rests with the movant, to prevail at the summary judgment stage, the movant must show that, "on all the essential elements of its case . . . , no reasonable jury could find for the nonmoving party." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc). On the other hand, if the non-moving party has the burden of proof at trial, the movant may prevail at the summary judgment stage either by negating an essential element of the non-moving party's claim or by pointing to specific portions of the record that demonstrate the non-moving party's inability to meet its burden of proof at trial. Clark, 929 F.2d at 606-08 (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Merely stating that the non-moving party cannot

---

[10]The Court is mindful that for purposes of summary judgment, only disputes about material facts are important. That is, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1244 (11th Cir. 2003) (citation omitted).

meet its burden at trial is not sufficient. Id. at 608. Evidence presented by the movant is viewed in the light most favorable to the non-moving party. Adickes, 398 U.S. at 157.

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark, 929 F.2d at 608. The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981). Rather, the non-moving party must respond either by affidavits or as otherwise provided in Fed. R. Civ. P. 56. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255 (quoting Adickes, 398 U.S. at 158-59). A genuine issue of material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

**B.    Mail-Tampering Claim**

Plaintiff claims that, while he was incarcerated at the CCDC, his mail was mishandled and sometimes opened by Defendants Woods and Carani. Although Defendants Woods and Carani argue that Plaintiff's mail-tampering claim is barred by the applicable statute of limitations,[11] Plaintiff's problem arises not from a failure to state a claim, but from a failure of proof. Naked accusations are no substitute for evidence and do not defeat

---

[11]Defendants Woods and Carani argue that, because Plaintiff commenced this case in July 2006 and he last complained about mishandled mail in December 2003, his mail-tampering claim is barred by the applicable statute of limitations. (Doc. no. 101, p. 10). Although Plaintiff filed a grievance and submitted statements concerning mail-tampering in August 2004 (doc. no. 106, Pl.'s Dep., Exs. 15, 16 & 18) and Plaintiff testified during his deposition that his legal mail was improperly handled sometime in 2004 (id. at 90-91), the Court need not determine, when addressing the merits of the instant motion, whether Plaintiff's mail-tampering claim is barred by the applicable statute of limitations.

summary judgment. See Leigh v. Warner Bros. Inc., 212 F.3d 1210, 1217 (11th Cir. 2000) (conclusory allegations without specific facts in support have no probative value). To survive summary judgment on his mail-tampering claim, Plaintiff must "put forward specific, nonconclusory factual allegations that establish improper motive causing cognizable injury." Crawford-El v. Britton, 523 U.S. 574, 598 (1998) (internal citation and quotation omitted). In other words, Plaintiff cannot "respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that [Plaintiff] has carried his [] burden of proving the pertinent motive." Id. at 600. Simply put, "Section 1983 requires proof of an affirmative causal connection between the actions taken by a particular person under color of state law and the constitutional deprivation." LaMarca v. Turner, 995 F.2d 1526, 1538 (11th Cir. 1993) (internal quotation marks and citations omitted).

Plaintiff has failed to produce more than conclusory allegations and uncorroborated hearsay. Although Plaintiff concludes that some of his letters failed to reach their destinations and that he believes that his mail was opened outside of his presence, he fails to provide any evidence establishing an affirmative causal connection between the actions taken by a particular person and the alleged deprivation. Simply put, there is no evidence in the record indicating that Defendants Woods or Carani, who maintain, *inter alia*, that their duties did not involve opening, handling, or distributing mail (doc. no. 107, Woods Aff., ¶¶ 17-24, Carani Aff., ¶¶ 6-13), tampered with Plaintiff's mail. Not only has Plaintiff failed to

13

produce evidence rebutting these Defendants' affidavits,[12] but when asked whether he had any evidence that Defendants Woods or Carani tampered with or mishandled his mail, Plaintiff indicated that he did not during his September 2007 deposition. (Doc. no. 106, Pl.'s Dep., pp. 44 & 87-88). Simply put, Defendants Woods and Carani correctly argue that Plaintiff has put forth no affirmative evidence regarding his mail-tampering claim. Therefore, Defendants Woods and Carani are entitled to summary judgment.

## C.    Equal Protection Claim

Plaintiff claims that, while he was incarcerated at the CCDC, he was prevented from utilizing certain calling cards because Defendant Woods implemented a policy allowing only foreign nationals to utilize the calling cards. Although Defendants Woods argues, *inter alia*, that Plaintiff's mail-tampering claim is barred by the applicable statute of limitations,[13] Plaintiff's problem arises not from a failure to state a claim, but from a lack of support by the relevant case law. First, the extent to which Plaintiff's rights might be burdened by a prison policy or regulation must be weighed against legitimate penological interests and against the

---

[12]Indeed, the only documentary evidence Plaintiff has produced related to this claim-- a letter, dated June 30, 2004, that he received from the NAACP--is somewhat adverse. (Doc. no. 127, Ex. 2). In short, this letter, which does nothing to substantiate Plaintiff's claim, indicates, *inter alia*, that the NAACP received his letter concerning his allegations about the CCDC. (See id. at 1).

[13]Defendant Woods argues that, because Plaintiff commenced this case in July 2006 and he last attempted to purchase a calling card in February 2004, his equal protection claim is barred by the applicable statute of limitations. (Doc. no. 101, p. 14). Although Plaintiff indicated during his deposition that he last attempted to acquire a calling card from officials at the CCDC in February 2004, he also suggested that he continued to acquire them from "Pay[-T]ell." (Doc. no. 106, Pl.'s Dep., p. 132). Furthermore, as previously noted, Plaintiff contends that he last attempted to acquire a calling card in July 2004. (Doc. no. 39, p. 9). Regardless, the Court need not determine, when addressing the merits of the instant motion, whether Plaintiff's equal protection claim is barred by the applicable statute of limitations.

deference that judges should give to the expertise and discretionary authority of prison officials. See Procunier v. Martinez, 416 U.S. 396, 420 (1974), *overruled on other grounds by* Thornburgh v. Abbott, 490 U.S. 401, 413-14 (1989). That is, the Court must be mindful that prison officials are owed "substantial deference" to their decisions regarding prison administration. Bass v. Perrin, 170 F.3d 1312, 1319 (11th Cir. 1999) (citing Bell v. Wolfish, 441 U.S. 520, 547-48 (1979)). Therefore, a prison regulation, even though it may infringe on an inmate's constitutional rights, will not rise to the level of an actionable constitutional violation unless the regulation is unreasonable. Hakim v. Hicks, 223 F.3d 1244, 1247 (11th Cir. 2000).

Stated another way, a prison policy will be upheld as a valid restriction on Plaintiff's constitutional rights if it is "reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987); see also O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987) (re-iterating the applicability of the "reasonableness" test); Pope v. Hightower, 101 F.3d 1382, 1384 (11th Cir. 1996) (citing Turner, 482 U.S. at 89). In conducting the reasonableness analysis, the Supreme Court requires this Court to consider the following factors:

> (1) whether there is a "valid, rational" connection exists between the policy and the legitimate government interest put forward to justify it; (2) whether there are alternative means of exercising the constitutional right that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources generally; and (4) whether the regulation represents an "exaggerated response" to prison concerns.

Pope, 101 F.3d at 1384 (citing Turner, 482 U.S. at 89-91); Solomon v. Zant, 888 F.2d 1579, 1581 (11th Cir. 1989) (same). In sum, Defendant Woods will prevail on summary judgment so long as he can show that his actions had a reasonable penological justification. Turner, 482 U.S. at 89.

In this case, the restricted sale of calling cards to foreign nationals is authorized by CCSO SOP 5-220, which states, "[T]he CCDC allows **foreign national** inmates to purchase phone calling cards through the Operations Sergeant." (Doc. 107, Woods Aff., Ex. 4, p. 1). This policy was implemented "[t]o accommodate treaties between the United States and foreign countries" and "so that [foreign national] inmates may keep in telephonic contact with their families." (Id.). Defendant argues (doc. no. 101, pp. 13-15), and the Court agrees, that there is a valid, rational connection between the contested policy and the CCDC's interest in managing the administrative and logistical burdens associated with processing, verifying payment, issuing, and recording the issuance of the subject calling cards. Furthermore, because the record clearly indicates that Plaintiff successfully made telephone calls and sent letters while incarcerated at the CCDC (doc. no. 106, p. 116; doc. no. 127, pp. 8-10, Ex. 2), alternative means of communication remained opened to him, and thus, Plaintiff's contentions concerning the use of the calling cards are unpersuasive[14] Although

---

[14]Indeed, prisoners do not have a constitutional right to any particular level of phone usage. Washington v. Reno, 35 F.3d 1093, 1100 (6th Cir. 1994); Benzel v. Grammar, 869 F.2d 1105, 1108 (8th Cir. 1989); Lopez v. Reyes, 692 F.2d 15, 17 (5th Cir. 1982). Similarly, the limitation of phone access has not been viewed as resulting in the type of deprivation that could reasonably be viewed as imposing an atypical and significant hardship on a prison inmate under the controlling analysis of Sandin v. Conner, 515 U.S. 472, 484 (1995). See Frazier v. Coughlin, 81 F.3d 313, 315-17 (2d Cir. 1996) (per curiam) (finding loss of certain privileges, including phone usage, did not amount to atypical and significant hardship). This is especially true where Plaintiff has not been denied access to alternative channels of

16

the parties disagree about the extent of the policy's impact, the parties agree that making the subject calling cards available to every inmate at the CCDC would have an impact on the prison staff and resources.[15] Simply put, in light of the rationale offered by Defendant Woods for the challenged policy, the availability of alternative means of exercising the constitutional right, and the impact on prison staff and resources, the Court finds that the policy is reasonable under Turner. Therefore, Defendant Woods is entitled to summary judgment.

## D.    Conditions of Confinement Claim

Plaintiff's claim that he has been subjected to unconstitutional conditions of confinement in the form of exposure to insects is governed by the Eighth Amendment, which imposes a duty on prison officials to provide humane conditions of confinement.[16] An Eighth Amendment claim based on a challenge to the conditions of confinement is judged

---

communication, such as the mail or personal visits.

[15]As previously noted, Defendant Woods contends, "[A]llowing inmates who are United States citizens to purchase international calling cards would impose an unduly heavy administrative and logistical burden on the [CCDC]." (Doc. no. 101, p. 13). Although Plaintiff maintains that Defendant Woods offers a "weak excuse" for the policy, he admits that making the cards available to all inmates would require the CCDC to process the cards using resources and staff charged with administering the commissary and that monitoring their use would utilize the system for monitoring other telephone calls. (Doc. no. 127, pp. 10-11).

[16]Although Plaintiff maintains that he "was entitled to a greater degree of protection than convicted inmates" because he was a pretrial detainee (doc. no. 127, p. 6), the Due Process Clause of the Fourteenth Amendment functions to provide pretrial detainees with essentially the same level of protection as that afforded convicted prisoners by the Eighth Amendment. See Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996); Hamm v. DeKalb County, 774 F.2d 1567, 1574 (11th Cir. 1985). Thus, although Plaintiff was being held at the CCDC as a pretrial detainee, the same legal standard applies.

by the deliberate indifference standard and must meet two requirements, one objective and one subjective. Farmer v. Brennan, 511 U.S. 825, 834 (1994); Wilson v. Seiter, 501 U.S. 294, 303 (1991).

To state the proposition differently, Eighth Amendment liability cannot be based on simple negligence or lack of due care, but rather requires some sort of conscious disregard of a serious and imminent risk. Id. at 835-39. Deliberate indifference that would violate the Eighth Amendment requires that Plaintiff show that Defendant Woods knew about and disregarded an excessive risk to Plaintiff's health or safety. See id. at 837. Plaintiff must first show that he suffered a deprivation that is "objectively, sufficiently serious," which means that Defendant Woods's actions resulted "in the denial of 'the minimal civilized measure of life's necessities.'" Farmer, 511 U.S. at 834 (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." Hudson v. McMillian, 503 U.S. 1, 9 (1992).

When subjectively weighing whether a defendant has been deliberately indifferent, the courts require a plaintiff to show "more than mere negligence," and look for "obduracy and wantonness, not inadvertence or error in good faith." Adams v. Poag, 61 F.3d 1537, 1543 (11th Cir. 1995). Plaintiff must prove that Defendant Woods had a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834. That is, Defendant Woods must have both been aware of the facts from which the inference could be drawn that a substantial risk of serious harm existed, and must also have drawn the inference. Id. at 837. It is not sufficient to determine that Defendant Woods should have known.

18

Bearing the above standard in mind, Defendant Woods is entitled to summary judgment. Plaintiff argues that, despite complaining to housing deputies and submitting a grievance to Defendant Woods, nothing was done about the "insect problem" at the CCDC. (Doc. no. 127, p. 6). Plaintiff further contends that, because Defendant Woods purposefully ignored the "insect problem," Defendant Woods exposed him to an unnecessary infliction of pain and unreasonable risk of serious damage to his health. (Id. at 7). Defendant Woods counters, "[P]laintiff has not demonstrated that the alleged 'insect infestation' posed an unreasonable risk of serious damage." (Doc. no. 101, p. 5). Defendant Woods also maintains that, because the CCDC is regularly treated for insects and Plaintiff was informed that he could notify his housing deputy if additional treatment was necessary, Plaintiff cannot show that he was deliberately indifferent. (Id. at 6).

In this case, the record demonstrates that Plaintiff has failed to satisfy the subjective component of his conditions of confinement claim because he has not refuted Defendant Woods's assertion that he reasonably responded to the risk Plaintiff brought to his attention. See Farmer, 511 U.S. at 846 ("[T]o survive summary judgment, [the plaintiff] must come forward with evidence from which it can be inferred that the defendant-officials . . . knowingly and unreasonably disregard[ed] an objectively intolerable risk of harm . . . ."). Plaintiff's allegations that Defendant Woods failed to act after being notified about an "insect problem" and ignored the "insect problem" are insufficient to satisfy the subjective component. See Scott v. District of Columbia, 139 F.3d 940, 943-44 (D.C. Cir. 1998) (explaining that, without evidence of the existence of any substantial risk of harm, there can be no knowing and unreasonable disregard of said risk). Rather, the record demonstrates that

the CCDC received regular, constant treatment for insects--at no time did Defendant Woods know about and disregarded an excessive risk to Plaintiff's health or safety. On August 2, 2004, Plaintiff filed a grievance concerning, *inter alia*, an "ant problem." (Doc. no. 107, Woods Aff., ¶ 6). Defendant Woods responded the next day by informing Plaintiff that the CCDC is sprayed monthly for insects and advising him to contact his housing deputy if additional treatment is desired. (Id., Woods Aff., Ex. 1). Defendant Woods then "notified the appropriate maintenance personnel that there might be an ant problem in the [CCDC], and [he] asked that something be done about the problem." (Id. Woods Aff., ¶ 9). Assuming, *arguendo*, that Plaintiff in fact contacted housing deputies as directed by Defendant Woods, the record establishes that, on August 17, 2004, the CCDC was treated for insects. (Id., DeLoach Aff, Ex. 1). Simply put, the record does not support the conclusion that Defendant Woods subjectively knew of a risk of serious harm to Plaintiff and disregarded that risk.[17] Therefore, Defendant Woods is entitled to summary judgment.

## E.    Retaliation Claim

Plaintiff's claim that Defendant Cook retaliated against him because he filed lawsuits and administrative grievances must also fail. The First Amendment prohibits prison officials from retaliating against inmates for filing lawsuits or administrative grievances, or for exercising the right of free speech. Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003);

---

[17]Although the parties disagree concerning whether the alleged "insect problem" constituted an unreasonable risk of serious damage (doc. no. 101, pp. 5-6; doc. no. 127, p. 7), the Court notes that Plaintiff has failed to provide any record evidence in support of his contention that the CCDC had an "insect problem." Nevertheless, because Plaintiff has failed to satisfy the subjective component of this Eighth Amendment claim, the Court need not determine, when addressing the merits of the instant motion, whether the alleged deprivation was "objectively, sufficiently serious."

Wright v. Newsome, 795 F.2d 964, 968 (11th Cir. 1986). Nor may prison officials burden an inmate's First Amendment rights "with practices that are not reasonably related to legitimate penological objectives" or "act with the intent of chilling that First Amendment right." Harris v. Ostrout, 65 F.3d 912, 916 (11th Cir. 1995) (*per curiam*) (discussing alleged violation of First Amendment right of access to the courts) (citations omitted). Where a plaintiff has failed to establish a causal connection between his protected conduct and the alleged retaliatory action, summary judgment for the defendant is proper. Farrow, 320 F.3d at 1248-49. Stated another way, "A prisoner can establish retaliation by demonstrating that the prison official's actions were 'the result of his having filed a grievance concerning the conditions of his imprisonment.'" Id. at 1248 (citing Wildberger v. Bracknell, 869 F.2d 1467, 1468 (11th Cir. 1989)). The Eleventh Circuit has ruled that "[d]irect evidence of an illegal motive will usually suffice to create a genuine issue of fact and preclude summary judgment." Harris, 65 F.3d at 917.[18]

Plaintiff contends that, after Defendant Cook made retaliatory statements on August 8, 2004, Defendant Cook directed Defendant Ellis, Defendant Williams, and Deputy Robertson to obtain false criminal warrants, which were subsequently dismissed, against him because he previously filed lawsuits and administrative grievances. (See doc. no. 127, pp. 14, 16 & 19). Defendant Cook counters that Plaintiff cannot establish that the adverse action

---

[18]In Harris, the Eleventh Circuit reversed the district court's decision granting summary judgment where the prisoner plaintiff submitted corroborating affidavits from fellow prisoners that stated a prison official commented that he filed disciplinary reports against the plaintiff, at least in part, in retaliation for prior litigation. Harris, 65 F.3d at 917.

was causally related to his protected expression. (Doc. no. 101, p. 29). In this regard, Defendant Cook submits that the criminal warrants obtained by Defendant Ellis, Defendant Williams, and Deputy Robertson were based on Plaintiff's refusal to comply with valid orders and fight with deputies, not because Plaintiff filed a lawsuit or grievance. (Id.).

Plaintiff proffers several self-serving conclusory allegations in support of his retaliation claim. For instance, Plaintiff claims that Defendant Cook directed CCDC officials pursue false charges, which were subsequently dismissed because Defendant Ellis was intoxicated. (Doc. no. 127, pp. 14, 16 & 19). Despite the fact that the criminal warrants obtained by Defendant Ellis, Defendant Williams, and Deputy Robertson appear to have been dismissed, Plaintiff has failed to establish any connection between his protected conduct and the alleged retaliatory action. In this regard, although Plaintiff provides the statement of Inmate Chapman, who states that he overheard officers developing a story with Defendant Cook to indicate "aggravating behavior" (doc. no. 127, Ex. 9), nothing in that statement suggests that Defendant Cook directed prison officials to seek criminal warrants against Plaintiff because he filed grievances or lawsuits. Rather, examination of the criminal warrants clearly establishes that Deputy Robertson, Defendant Ellis, and Defendant Williams obtained them because of Plaintiff's alleged behavior during the August 8, 2004 incident. (Doc. no. 107, Ellis Aff., Ex. 1, Williams Aff., Ex. 1; 127, Ex. 12). Indeed, Defendants Ellis and Williams submit that, on August 9, 2004, they obtained criminal warrants against Plaintiff because he allegedly refused to follow orders and fought with officers. (Id., Ellis

22

Aff., ¶ 45, Williams Aff., ¶ 19). Simply put, examination of the record does not support Plaintiff's conclusory allegation that Defendant Cook directed CCDC officials to obtain criminal warrants against him because he filed grievances and lawsuits. Therefore, Defendant Cook is entitled to summary judgment.

## F.    Excessive Force Claims

### 1.    Defendant Cook

Plaintiff claims that Defendant Cook was present during the August 8, 2004 incident and that he was threatening other inmates to stay out of the struggle. However, Plaintiff's excessive force claim against Defendant Cook also suffers from a failure of proof. As previously discussed, to survive summary judgment, Plaintiff must "put forward specific, nonconclusory factual allegations that establish improper motive causing cognizable injury." Crawford-El, 523 U.S. at 598 (internal citation and quotation omitted). Furthermore, "Section 1983 requires proof of an affirmative causal connection between the actions taken by a particular person under color of state law and the constitutional deprivation." LaMarca, 995 F.2d at 1538 (internal quotation marks and citations omitted). In this case, Plaintiff has failed to refute Defendant Cook's assertion that he was not involved in the August 8, 2004 incident and that he did not utilize force against Plaintiff. Although Plaintiff generally argues that Defendant Cook was "a part of the Campaign of Harassment" and that Defendant Cook retaliated against him (doc. no. 127, pp. 13-16), he does not allege or establish that

Defendant Cook was present during the August 8, 2004 incident. Simply put, there is no evidence in the record indicating that Defendant Cook, who maintains, *inter alia*, that he was not present during the August 8, 2004 incident (doc. no. 107, Cook Aff., ¶¶ 9-10), utilized excessive force against Plaintiff. Indeed, when asked during his deposition to describe the basis of his claims against Defendant Cook, Plaintiff merely indicated that he was suing Defendant Cook because he retaliated against him. (Doc. no. 106, Pl.'s Dep., pp. 48-49). Therefore, Defendant Cook is entitled to summary judgment.

**2. Defendants Ellis, Williams, and Streetman**

Plaintiff claims that, on August 8, 2004, Defendant Ellis, who was allegedly under the influence of narcotics, sprayed him in the face with pepper spray without provocation and that Defendant Williams struggled with him, resulting in various injuries. "The Eighth Amendment's proscription of cruel and unusual punishments also governs prison officials' use of force against convicted inmates."[19] Campbell v. Sikes, 169 F.3d 1353, 1374 (11th Cir. 1999). To prevail on his excessive use of force claims, Plaintiff must satisfy both an objective and subjective component. Farmer v. Brennan, 511 U.S. 825, 834 (1994). Objectively, Plaintiff must show that he suffered a "sufficiently serious" deprivation that was harmful enough to establish a constitutional violation. Id. Although there is no requirement that a plaintiff suffer significant injury, "'*de minimis*' uses of physical force" are beyond constitutional recognition, provided that the use of force is not of a sort "repugnant to the

---

[19]As previously noted, the Due Process Clause of the Fourteenth Amendment functions to provide pretrial detainees with essentially the same level of protection as that afforded convicted prisoners by the Eighth Amendment. See Cottrell, 85 F.3d at 1490; Hamm, 774 F.2d at 1574.

conscience of mankind." Hudson v. McMillian, 503 U.S. 1, 9-10 (1991). The Supreme

Court has explained that not "every malevolent touch by a prison guard gives rise to a federal

cause of action." Id. at 9 ("Not every push or shove, even if it may later seem unnecessary

in the peace of a judge's chambers, violates a prisoner's constitutional rights." (citation

omitted)).

Subjectively, Plaintiff must show that the actions taken involved the unnecessary and

wanton infliction of pain. See Whitley v. Albers, 475 U.S. 312, 319 (1986). That is, "force

does not violate the Eighth Amendment merely because it is unreasonable or unnecessary:

'The infliction of pain in the course of a prison security measure . . . does not amount to cruel

and unusual punishment simply because it may appear in retrospect that the degree of force

authorized or applied for security purposes was unreasonable, and hence unnecessary in the

strict sense.'" Campbell, 169 F.3d at 1374 (quoting Whitley, 475 U.S. at 319). Rather, the

Court must consider "'whether force was applied in a good-faith effort to maintain or restore

discipline, or maliciously and sadistically to cause harm.'" Harris v. Chapman, 97 F.3d 499,

505 (11th Cir. 1996) (quoting Hudson, 503 U.S. at 7). Moreover, the use of restraints is

permitted to control inmates who are causing a disturbance, attempting to incite other

prisoners, or who represent a danger to themselves or others. Williams v. Burton, 943 F.2d

1572, 1575-76 (11th Cir. 1991) (per curiam).

The analysis of the subjective component of an Eighth Amendment excessive force

claim is contextual and requires consideration of many factors: (1) the extent of injury, (2)

the need for the application of force, (3) the relationship between the need and the amount

of force used, (4) the threat reasonably perceived by the responsible officials, and (5) any

efforts made to temper the severity of a forceful response. Hudson, 503 U.S. at 7; Campbell, 169 F.3d at 1375 (quoting Whitley, 475 U.S. at 321). Any action taken should be viewed in light of the wide-ranging deference accorded prison officials acting to preserve discipline and institutional security.[20] Hudson, 503 U.S. at 6.

Despite this deference to allow the application of preventative measures intended to reduce the incidences of breaches of prison discipline, an Eighth Amendment violation occurs when the force used was not necessary to maintain order or discipline. Skrtich v. Thornton, 280 F.3d 1295, 1301-02 (11th Cir. 2002). The Eleventh Circuit has also ruled that the continued use of harmful force once the necessity for the use of force ceases, as well as any physical abuse directed at a prisoner after he ceases his resistance to authority, may be an Eighth Amendment violation. Williams, 943 F.2d at 1576. Moreover, the Eleventh Circuit has ruled that the use of force on an incapacitated inmate is an Eighth Amendment violation. Skrtich, 280 F.3d at 1302.

In this case, Plaintiff and Defendants Ellis, Williams, and Streetman dispute nearly all of the essential facts related to Plaintiff's excessive force claims. To illustrate, the parties dispute: (1) the need for the application of the utilized force, (2) the intent in using force, (3) efforts made to temper the severity of a forceful response, and (4) the existence and severity of any the resulting injury. Plaintiff avers that, because he exposed that Defendant Ellis was intoxicated on August 8, 2004, Defendant Ellis sprayed him in the face with pepper spray while he was sitting on his bed, Defendant Williams ordered deputies to uncover his face so

---

[20]For example, use of an appropriate degree of force to compel compliance with a valid order is justified. Brown v. Smith, 813 F.2d 1187, 1189 (11th Cir. 1987).

that it could be sprayed, and he was transported to C-Max in handcuffs. Plaintiff also maintains that, while standing in his doorway talking with another officer on August 31, 2004, Defendant Streetman "blind sided" him, sprayed his face with pepper spray, and shoved him into his room. Conversely, Defendants Ellis and Williams aver that, after Plaintiff used an explicative, refused to comply with orders, ignored warnings, and took an aggressive posture, Defendant Ellis sprayed Plaintiff with pepper spray, and that they handcuffed Plaintiff because he was resisting and fighting officers. Defendant Streetman also maintains that, after Plaintiff refused to comply with a valid order, covered his face with a towel, and ignored a warning, he sprayed Plaintiff with pepper spray in an effort to maintain order and avoid physical confrontation. Although the record suggests Plaintiff may have been subject to discipline, a jury might conclude that the incidents do not constitute "good-faith effort[s] to maintain or restore discipline," but were an application of force performed "maliciously and sadistically to cause harm." Hudson, 503 U.S. at 7.

Turning to the issue of injuries, Plaintiff maintains that, as a result of the August 8 and 31, 2004 incidents, he suffered from various injuries, eye irritation, and asthma attacks, which continue to this day. (Doc. no. 39, pp. 6-7; doc. no. 127, Pl.'s Aff, ¶15). Defendants Ellis, Williams, and Streetman argue that, because Plaintiff cannot establish more than *de minimis* injury, the excessive force claims should be dismissed.[21] (Doc. no. 101, pp. 26-27).

---

[21]In Plaintiff's August 8, 2004 statement, he states, *inter alia*, "I never received the effects of the spray. I never coughed, sneezed, choked, or gagged." (Doc. no. 107, Woods Aff., Ex. 6, p. 3). Notably, Plaintiff provides a June 16, 2006 Health Service Request Form, wherein he indicates, "My asmtha [sic] inflames 4 to 5 times every 24 hours now. Along with the eye irritation [I have] been experiencing for the last 2-3 weeks, [it is] evident [that is] the second hand smoke causing it." (Doc. no. 127, Ex. 17, p. 3). Plaintiff's August 10, 2006 Health Service Request Form states, "Eye irritation seems worst, possibly hay fever .

However, the Court finds this argument unpersuasive. In this regard, the absence of injury alone is not a sufficient basis upon which to dismiss an Eighth Amendment claim. Id. at 4-7. If this were not the case, "the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." Id. at 9. Furthermore, if this argument were accepted by the Court, then other forms of force applied to prisoners such as choking or the use of electric shock, which leave no lasting marks or visible injuries beyond a short period of time, would be insufficient to support an excessive force claim. To the contrary, when inflicted without justification, these forms of force are sufficient to state a claim under the Eighth Amendment. See Williams v. Bramer, 180 F.3d 699, 704 (5th Cir. 1999) (choking committed in the absence of any valid reason was a injury that precluded summary judgment); Hickey v. Reeder, 12 F.3d 754 (8th Cir. 1993) (prisoner shot with stun gun when he refused to sweep his cell properly stated a claim under the Eighth Amendment). Similarly, Plaintiff's alleged injuries,[22] if inflicted without sufficient justification, might form the basis for liability under the Eighth Amendment. Simply put, when viewing the facts in the light most favorable to Plaintiff, the Court finds that there exist genuine issues of material fact that preclude summary judgment as to Plaintiff's excessive force claims against Defendants Ellis, Williams, and Streetman.[23]

---

. . ." (Id. at 5).

[22]The Court reminds the parties that, at this stage of the proceedings, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255 (quoting Adickes, 398 U.S. at 158-59).

[23]Defendants Ellis, Williams, and Streetman also argue that they are entitled to qualified immunity as it relates to Plaintiff's excessive force claims against them. (Doc. no. 101, pp. 27-28). However, in the Eleventh Circuit, "[a] defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because

In sum, viewing the evidence in the light most favorable to Plaintiff, the Court finds that there is no genuine issue as to any material fact related to Plaintiff's mail-tampering claim, equal protection claim, conditions of confinement claim, retaliation claim, and excessive force claim against Defendant Cook.[24] Nevertheless, when viewing the facts in the light most favorable to Plaintiff, the Court finds that there exist genuine issues of material fact related to Plaintiff's excessive force claims against Defendants Ellis, Williams, and Streetman. Therefore, although Defendants Woods, Carani, and Cook are entitled judgment as a matter of law, Plaintiff's remaining excessive force claims against Defendants Ellis, Williams, and Streetman should proceed.

---

the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution . . . ." Skrtich, 280 F.3d at 1301 (citing Johnson v. Breeden, 280 F.3d 1308 (11th Cir. 2002)) (concluding that the district court did not err when denying the defendant's motion for summary judgment because no qualified immunity defense was available to the officers alleged of beating the plaintiff in violation of his Eighth Amendment rights). As the Court cannot presently determine, because there are genuine disputes of material fact, whether these Defendants utilized excessive force to maliciously and sadistically harm Plaintiff, "[t]here is simply no room for a qualified immunity defense . . . ." Id. at 1301 (citing Johnson, 280 F.3d at 1321).

[24]Defendants Woods, Carani, and Cook also argue that they are entitled to qualified immunity as it relates to Plaintiff's various claims against them. (Doc. no. 101, pp. 6-8, 11, 15-16, 27-28, & 30). However, the Court's conclusion that these claims are without merit pretermits consideration of these qualified immunity arguments. Scott v. Harris, ___ U.S. ___, 127 S. Ct. 1769, 1744 (2007); see also Cuvillier v. Rockdale County, 390 F.3d 1336, 1338 n.4 (11th Cir. 2004) (explaining that the availability of the qualified immunity defense is "immaterial" when no underlying constitutional violation exists).

### III. CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** that the Columbia County Defendants' motion for summary judgment (doc. no. 100) be **GRANTED IN PART** and **DENIED IN PART**, that a final judgment be **ENTERED** in favor of Defendants Woods, Carani, and Cook, and that Plaintiff's remaining excessive force claims against Defendants Ellis, Williams, and Streetman should proceed.[25]

SO REPORTED and RECOMMENDED this 29th day of July, 2008, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE

---

[25]The Court will address the motion for summary judgment filed by Defendant Warren (doc. no. 95) in a simultaneously filed Report and Recommendation.